IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 15 CR 379-1 |
| | ) | Judge GARY FEINERMAN |
| LEVAUGHN COLLINS, | ) | |
| Defendant. | ) | |

*DEFENDANT LEVAUGHN COLLINS' CONSOLIDATED MOTIONS IN LIMINE*

DEFENDANT LEVAUGHN COLLINS, through counsel, respectfully requests that this Honorable Court enter an order: (a) prohibiting the introduction of evidence related to an alleged conflict between associates of James Triplett and an unnamed other person(s); (b) denying the government's request to bar missing witnesses; (c) prohibiting evidence or testimony about alleged gang membership; (d) permitting evidence and argument about punishment. In support of these requests, Mr. Collins, through counsel, states the following:

I.  Evidence of an alleged conflict between James Triplett and an unnamed other person or persons must be barred from evidence pursuant to FRE 401, 401, 402, 403, and 404(b).

The question of whether or not there was a disagreement between Jimmy Triplett and another person or persons is not relevant to the charged offenses in this case and has no bearing at all on any decision or action taken by Levaughn Collins. Any evidence about an alleged conflict must be barred from admission at trial because it has no probative value with respect to the charges against Mr.

1

Collins, and its prejudicial impact far outweighs any probative value alleged by the government.

Admission of this evidence will create a trial within a trial that will be confusing and ultimately achieve nothing except prejudice against the defendants, increasing the likelihood that decisions with respect to guilt or innocence will be made based on emotional reactions to the conversations rather than a measured evaluation of the evidence that is relevant to the charged offenses.

    A.    The government's interpretation of the conversations was incorrect and not corroborated by the traffic stop in which no weapons were recovered.

There was no "armed conflict" between unnamed individuals and Mr. Collins, or anyone related to him. There was a report of an incident – relayed second hand from James Triplett to Mr. Collins – according to which unnamed others "upped" guns on people in the neighborhood of Grenshaw and St. Louis. The conversations supplied by the government in its Motion *in Limine*, Doc. 373, pp. 3-8, show that unnamed individuals were behaving in a threatening manner to people who were in the neighborhood of Grenshaw and St. Louis on the Westside of Chicago. The alleged mentions of firearms all refer to guns being in the possession of others. Neither Mr. Triplett, nor Mr. Collins, talk about getting guns, carrying guns, having guns, much less using guns against these individuals. Despite the government's alleged concerns, when the traffic stop was conducted, no weapons were recovered.

The conversation about the people who were threatening others with guns took place between June 18-June 20, 2015. It is clear that after the initial

2

allegation that some unnamed individuals "upped" on other unnamed individuals, no further interaction took place. The conversations on June 20, 2015, by the government's own interpretation reveal that the individuals who had previously "upped" weapons were hanging around the same area "naked", or without weapons. Mr. Collins and others were arrested on June 24, 2015. No actual conflict ever occurred, and at no point did Mr. Collins talk about using firearms, instruct others to use firearms, make any reference to the alleged stash house, or otherwise take any action that would indicate that he intended to take possession of a firearm or use it against anyone.

    Mr. Collins was in his home on the North side of Chicago when most of the conversations took place. He was not surveilled in or around the alleged stash house, or in the neighborhood where the supposed-conflict was to take place. Admitting these conversations into evidence and building a theory around them that has no basis in reality, will distract from the trial on the charged offenses and create a trial within a trial that ultimately will serve only to unfairly prejudice Mr. Collins.

    B.    The calls are not the direct evidence of any crime committed by Mr. Collins, Mr. Triplett, or any other defendant on trial.

    In the first instance, there is no evidence in the conversations that the unnamed individuals are drug dealers, gang members, or young people with another interest in the neighborhood. The government would have to put on evidence that is not relevant to the case at bar to establish who the unnamed individuals who were frequenting the area of St. Louis and Grenshaw, on the west

3

side of Chicago were, evidence to show that they were drug dealers, evidence that they were organized and actually formed a "drug trafficking organization", and additional evidence to show that they were rivals of Mr. Triplett or anyone else charged in the indictment. It's clear from the conversations that Mr. Triplett had heard this information second-hand, that neither he nor Mr. Collins were actually in the area where the unnamed individuals were hanging out, and that by the time Mr. Gardner went to check on the situation the unnamed others were "naked".

The government takes Mr. Collins' questions out of context and claims that call #242 demonstrates that Mr. Collins "expressed concern that the actions of the 'rival DTO' had caused workers for the Triplett DTO to stop selling narcotics." In fact, that conversation, in context, shows Mr. Collins trying to calm Mr. Triplett who was upset about what he had been told. Mr. Collins tells Mr. Triplett, "Yeah, yeah, I understand what you saying, but you all ain't shut down did you?" In other words, its not that bad – no one chased you out of the neighborhood. Further in the conversation, it becomes clear that it was the others who came after some of Triplett's friends with guns, and that his friends ran away - they didn't pull out weapons in response to the threats, but ran away from them.

Triplett is recounting a story that he had been told, "…from my understanding, he told me, they told me this nigga come down there. They come down there, upped, talkin' about, joe mad. If we ain't doin nothing, ain't nobody doin' nothing, and by they had pipes [guns], you know, niggas got outta there and shit. You know what I'm saying?" Doc. 373, p.4. What is important here is what he

4

doesn't say – he doesn't say that his friends had "pipes" too and there was a gun fight, nor does he say that his friends have to retaliate immediately.

These conversations make clear that Mr. Triplett, Mr. Collins, and Mr. Gardner did not immediately believe the story, took reasonable measures to check out the situation, and at no time went into the neighborhood with weapons, looking to escalate whatever problem had occurred. Law enforcement's efforts to preempt a gun fight, turned out to be unnecessary on June 20, 2015, and the government's fear about what the conversations meant turned out to be incorrect. The fact that the government took no further action for 4 days after discovering nothing in the course of the traffic stop on June 20, 2015, is a tacit acknowledgment that they were wrong.

The government reaches when it claims that discussions between Triplett, Collins, and Gardner provide evidence of conspiracy. These conversations never reach any agreement, largely concern investigation of a potential problem, and do not bear on the alleged agreement to sell drugs or the allegations of possessing weapons in furtherance of a drug trafficking offense. That Mr. Collins knows Mr. Triplett and Mr. Gardner is not a disputed issue at trial. These men have been friends for many years.

The government's reliance on *Pinkerton v. United States,* 328 U.S. 640 (1946), to hold Mr. Collins and others responsible for firearms found in a house that does not belong to Mr. Collins or any person on trial, into which Mr. Collins is never seen going, from which no one is ever seen taking any firearms of any kind, is not an

5

argument that supports the admission of the phone conversations at issue, because the possession or use of firearms by Mr. Triplett, Mr. Collins, or any of their friends, is never a part of the conversations. The conversations are not evidence of "an armed dispute with a rival DTO," but a more limited situation in which there was a report that unidentified others came after Triplett's associates with firearms – never that Mr. Collins was involved with planning to fight firearms with firearms.

    C.    Conversation evidence is not admissible pursuant to Federal Rule of Evidence 404(b), because it does not support a finding that anyone on trial committed any illegal act.

The calls at issue are neither direct evidence of any crime, nor are they admissible to show the defendants' motives to possess firearms on June 24, 2015. First of all, the conversations do not show motive for any illegal conduct on the part of Mr. Collins or any other individual on trial. The traffic stop on June 20, 2015, clearly demonstrated that neither Mr. Collins, nor any of his friends were planning to respond to the reported threats with violence. Secondly, a conversation that leads to no conflict on June 18, 19, or 20, does not provide evidence of any motive to engage in an illegal act 4 days later. Thirdly, on June 24, 2015, Mr. Collins was arrested in his home on the northeast side of Chicago. He was not then, nor was he ever, during the course of the alleged conspiracy, in possession of a firearm. No firearms were found on his person, in his home, or in any of his vehicles. The firearms found in the empty house, alleged to have been a "stash" house, were in containers and closets. As stated above, the house was neither owned nor rented by Mr. Collins, Mr. Triplett, or any other person on trial.

6

No witnesses at trial will testify that Mr. Collins carried a weapon, that he ever frequented the neighborhood where Mr. Triplett and his associates were present, or that Mr. Collins talked about having, purchasing, storing, hiding, or being involved with weapons of any kind, especially firearms, for any reason. Nor will there be evidence at trial that he directed others to do so.

The government's citation to *United States v. Schmitt,* 770 F.3d 524 (7th Cir. 2014), is inapt in Mr. Collins' case. In *Schmitt,* a large quantity of drugs was found in Mr. Schmitt's home. The fact that drugs were found in Schmitt's home was found admissible to demonstrate why Mr. Schmitt might have a gun. In this case, no narcotics or guns were found in Mr. Collins' home, storage areas, or vehicles. The government's evidence against Mr. Collins consists chiefly of its interpretations of phone conversations. The conversations, discussed above, do not prove directly or indirectly Mr. Collins' possession of a weapon in furtherance of a drug offense. There is no "propensity-free chain of reasoning" that can explain the introduction of the phone conversations the government seeks to admit.

The Supreme Court has long discouraged the "piling of inference upon inference" to achieve an evidentiary or jurisdictional connection. "In *Lopez*, for example, the Court held that the Federal Government lacked power, under the Commerce Clause, to criminalize the possession of a gun in a local school zone. Possessing a gun near a school, the Court reasoned, "is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce." *United States v. Lopez,* 514 U.S. 549, 567 (1995) (noting that

7

the Court would have "to pile **inference upon inference**" to conclude that gun possession has a substantial effect on commerce).

The Court in *Anderson v. United States,* declared itself in favor of carefully analyzing conspiracy cases, finding that "we scrutinize the record for evidence of such intent with special care in a conspiracy case for, as we have indicated in a related context, " ***charges of conspiracy are not to be made out by piling inference upon inference, thus fashioning . . . a dragnet to draw in all substantive crimes***." *Direct Sales Co*. v. *United States*, 319 U.S. 703, 711 (1943). See also *Ingram* v. *United States*, 360 U.S. 672, 680 (1959). *Anderson V. United States*, 417 U.S. 211, 224 (1974).  *See also, United States v. Wilson,*879 F.3d 795, 797 (7th Cir. 2018) (In a case that hinges on circumstantial evidence, courts must not permit a verdict based solely on the piling of **inference upon inference**).

The inferences pile high in order to reach the point the government seeks, to justify the admission of these phone conversations: (1) one must infer from the second-hand story that James Triplett relates to Mr. Collins that the people involved are all drug dealers; (2) that the groups of individuals in the neighborhood in addition to being all drug dealers also are rivals; (3) that the unsubstantiated allegation that some unidentified people came into the neighborhood with guns and chased others away, means that those chased will obtain guns to defend themselves; (4) that the unproductive investigation by associates of Mr. Collins that revealed the "others" to be "naked" will result in Mr. Collins ordering as yet unidentified persons to obtain guns; (5) that the guns they will obtain will come from a house

8

that is not in the neighborhood and does not belong in any way to Mr. Collins; (6) that Mr. Collins was aware that were guns in the closets and containers located in that house; (7) that Mr. Collins was willing to share them; (8) that Mr. Triplett and his associates did not already have weapons; (9) and that a violent conflict would occur when there was no evidence of any such conflict or the possession or use of weapons by Mr. Collins during the multi-month investigation conducted by both the Chicago Police Department and federal law enforcement agents.

> D. The calls must be barred under Federal Rule of Evidence 403, because the beliefs and unrealized fears of government agents are not evidence, rendering the probative value of the calls far less than the prejudicial value of their admission.

Federal Rule of Evidence 403 provides that "[t]he court may elude relevant evidence if its probative value is substantially outweighed by a danger of one or more the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." In this case, the introduction of these calls will result in a trial within a trial which will create unfair prejudice by suggesting that there was a violent component to this case, when there was not; and will confuse the issues and mislead the jury as to which issues are properly before them. The government need not directly suggest "that defendants committed actual acts of violence against the rival DTO." That is the picture they will paint for the jury, based on their interpretation of the calls – offered not by any participant in the calls, but by the speculative testimony of agents.

The government will have to present some evidence of who the individuals were who were the subject of the "story", show that they, too, were a group of drug dealers – or a drug trafficking organization, and further show that these individuals were rivals for someone, since neither Mr. Collins, nor Mr. Triplett accept that characterization in the context of the calls.

Finally, Mr. Collins is charged with conspiracy to possess and distribute heroin, and with the possession of weapons. The calls do not add any direct or indirect evidence to support either of these contentions. No actual possession of weapons, no discussion of having or using weapons, and no conversation- let alone agreement - about the sale of drugs happens during the course of the proffered conversations. When agents intervene and conduct a traffic stop expecting to find weapons, they are disappointed. On the other hand, the unfair prejudice that will result is the unjustified and unsubstantiated picture the government will paint of Mr. Collins and his friends being gun-toting drug dealers itching for a fight. The evidence must not be admitted for any of the purposes sought by the government.

II. The government's request that the court preclude missing witness argument is vague, premature, and possibly not well-founded, and should not be granted.

The government does not say who the "missing witnesses" may be who may be the subjects of argument. If, for example, the government has concerns about argument relating to co-defendants who will not be witnesses in this case, it is not at all clear that a missing witness instruction would not be appropriate, since it is the government's bargaining position with respect those defendants' ability to plea

without fear of the government filing a notice pursuant to Title 21, United States Code, Section 851, and the failure of the government to take any of these individuals to sentencing that puts them beyond the reach of the defense, or renders them "pragmatically unavailable."

The Seventh Circuit leaves the decision to give or withhold a missing witness instruction to the discretion of the District Court. "A missing witness instruction is warranted if the absent witness was peculiarly within the government's power to produce; and if the testimony would have elucidated issues in the case and would not merely have been cumulative. As to the first element, a witness is peculiarly within a party's power to produce if he either: (1) is physically available only to that party; or (2) has such a relationship with one party as to effectively make him unavailable to the opposing party, regardless of actual physical availability. The latter prong is also referred to as "pragmatic unavailability." *United States v. Villegas*, 655 F.3d 662, 664, (7th Cir. 2011).

A missing witness instruction is more typically given in the case of employees or associates of the party opposing the instruction who may have a stake in the outcome, such as police officers or federal law enforcement agents. To the extent that the government declines to call certain law enforcement witnesses, it may face a request for a missing witness instruction. *See, e.g., See United States v. Christ*, 513 F.3d 762, 773 (7th Cir. 2008); *Yumich v. Cotter*, 452 F.2d 59, 64 (7th Cir. 1971) (finding that the employment by the city of uncalled police officers who witnessed an altercation between officers and the plaintiff, as well as the officers' "strong

11

personal interest in the success of the city's defense of their conduct . . ." rendered them pragmatically [**20] unavailable to the plaintiff); *see also United States v. Mahone*, 537 F.2d 922, 926-27 (7th Cir. 1976) (holding that an officer who was involved in the arrest initiating case was pragmatically unavailable to the plaintiff because of his association with the United States in building its case, as well as his "interest in seeing his police work vindicated by a conviction of the defendant").

Without more specificity with respect to the government's concerns, or any indication, whatsoever, that anyone is at this stage committed to seeking a missing witness instruction, or making a missing witness argument, it is premature for the Court to make a blanket ruling on this issue.

III.     Evidence or argument about alleged gang affiliation of any party is irrelevant, unfairly prejudicial, violative of the First Amendment, and must be barred.

Gang affiliation is not relevant to any issue at trial, and the introduction of the word "gang" or specific references to particular "gangs" will be used only to inflame the fears and passions of the jurors. Law enforcement officers and agents often engage in the practice of categorizing people as gang members or associates based on where they live or where they grew up, whether or not any given individual actively belongs to, joined, or was a willing participant in any gang. Recent controversy around the Chicago Police Department's maintenance of a gang database is illustrative of the problem.[1]

---

[1] For example, an August 9, 2018, headline in the Chicago Tribune was, "Nearly 33,000 Juveniles Arrested Over last two decades labeled as Gang Members by Chicago Police," Anne Sweeney and Paige Fry, opened with, "The records, released as a result of an open

The Supreme Court has long cautioned against the use of affiliation and association against a person, as it may violate an individual's First Amendment right to associate freely with those who hold similar beliefs or share a common purpose. "We have held that the First Amendment protects an individual's right to join groups and associate with others holding similar beliefs. See *Aptheker* v. *Secretary of State*, 378 U.S. 500, 507, 12 L. Ed. 2d 992, 84 S. Ct. 1659 [**1097] [*164] (1964); *NAACP* v. *Alabama ex rel. Patterson*, 357 U.S. 449, 460, 2 L. Ed. 2d 1488, 78 S. Ct. 1163 (1958). *Dawson v. Delaware*, 503 U.S. 159, 163-164 (1992). In *Dawson,* the Court found that the receipt into evidence of the stipulation regarding [Dawson's] membership in the Aryan Brotherhood was constitutional error. *Id*. at 165.

The Seventh Circuit has urged District Court's to consider the admission of such evidence carefully. "Our cases have "long recognized the substantial risk of unfair prejudice attached to gang affiliation evidence, noting such evidence is likely to be damaging to a defendant in the eyes of the jury and that gangs suffer from poor public relations." *United States v. Irvin*, 87 F.3d 860, 864 (7th Cir. 1996) (internal quotation marks omitted). "We therefore require careful consideration by

---

records fight by the Chicago Tribune, provide the first look at gang data kept by the Police Department for those 17 or younger, most of whom were African-Americans and Hispanics from historically violent neighborhoods such as Lawndale and Back of the Yards." http://www.chicagotribune.com/news/local/breaking/ct-met-chicago-police-gang-database-juveniles-20180725-story.html

district courts in determining the admissibility of gang membership and gang activity evidence." *Id.; see also United States v. Montgomery*, 390 F.3d 1013, 1018 (7th Cir. 2004) ("[I]n our review we examine the care and thoroughness with which a district judge considered the admission or exclusion of gang-involvement evidence."). *United States v. Dillard*, 884 F.3d 758, 764 (7th Cir. 2018). *See also United States v. Alviar*, 573 F.3d 526, 536 (7th Cir. 2009) (stating that "[w]e have recognized there is substantial risk of unfair prejudice attached to gang affiliation evidence . . . .").

In this case, alleged gang affiliation has little or nothing to do with how the defendants on trial know each other. There will be no dispute that some of the defendants on trial do know each other and have been friends over a long period of time. Whether or not the defendants on trial agreed to participate in the sale of controlled substances is not proved by gang affiliation, where there is no alleged single shared affiliation among the defendants on trial, who also do not live, work, or socialize in the same neighborhoods or with the same groups of people.

Mr. Collins asks that any reference to gangs, gang affiliation, any particular gang, work on "gang" task forces, or with "gang" units of any law enforcement group be barred from introduction into evidence in this case, on the ground that any slight probative value it might have would be substantially outweighed by unfair prejudice in this case.

14

IV. Mr. Collins asks that this Court permit evidence and argument about punishment at trial.

The rationale behind the traditional prohibition against presenting evidence and argument about punishment at trial, is that historically punishment has not been a matter for the jurors to decide, but one left to the judge. *Shannon v. United States*, 512 U.S. 573, 579, 114 S. Ct. 2419, 129 L. Ed. 2d 459 (1994) ("It is well established that when a jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed.'") (quoting *Rogers v. United States*, 422 U.S. 35, 40, 95 S. Ct. 2091, 45 L. Ed. 2d 1 (1975)).

This is not the case in the context of the death penalty, and, post -*Booker*,[2] it is also not the case when the offenses charged require the jury to decide facts, such as drug quantity and whether a defendant possessed a firearm, that will establish whether or not certain mandatory minimum sentences will be triggered, setting the floor for the sentencing judge's decision about punishment in the event of conviction.

The cases relied upon by the Seventh Circuit clearly base their reasoning on the non-participation of jurors in sentencing decisions. "[W]e note that the practice of informing juries about the sentencing consequences of their verdicts is strongly disfavored. The Supreme Court has stated that, **unless a jury has a role in sentencing**, such as in capital sentencing proceedings, jurors should be instructed not to consider a defendant's potential sentence during deliberations. *See Shannon v. United States*, 512 U.S. 573, 114 S. Ct. 2419, 2424, 129 L. Ed. 2d 459 (1994). The

---

[2]

*Shannon* Court also pointed out that jurors generally "are not informed of mandatory minimum or maximum sentences." 114 S. Ct. at 2428. *See United States v. Chesney*, 86 F.3d 564, 574 (6th Cir. 1996)." *United States v. Lewis*, 110 F.3d 417, 422 (7th Cir. 1997).

In this case, the decisions the jury will be asked to make about drug quantity will have a particularly dramatic effect on the potential penalties in Mr. Collins case. Not only will a finding that one kilogram of heroin or more was involved in the conspiracy trigger the 10-year mandatory floor, but due to the government's 851 notice, the mandatory floor doubles and becomes 20 years. When, as here, the jury will be asked to make decisions that directly and irretrievably lock-in particular penalties, the jury should know the consequences of the decision, just as the jurors in a death penalty case must know and be able to bear the consequences of a jury's decision to impose the ultimate penalty.

Similarly, a finding of guilt with respect to the possession of firearms triggers an automatic 5-year consecutive sentence that is not modifiable by the Court. The jury is directly involved with that sentencing outcome and has both the right and the responsibility to know the consequences of the decision they make. In this case, jurors are potentially responsible for an unalterable mandatory minimum sentence of 25 years for Mr. Collins, a decision which essentially deprives him of the rest of his most productive working and family-raising years.

In view of the dramatic imbalance in the nature of punishment for federal drug offenses – often far more severe than even state penalties for murder or other

16

Class X felonies for which the basic penalty range is 6 to 30 years, and in view of the degree of social dissatisfaction with the phenomenon of mass incarceration of African-American men like Mr. Collins and his co-defendants, allowing jurors to know the consequences of the sentencing determinations we will be asking them to make is both fair and necessary.

WHEREFORE, DEFENDANT LEVAUGH COLLINS, through counsel, respectfully requests that this Honorable Court enter an Order: (a) prohibiting the introduction of evidence related to an alleged conflict between associates of James Triplett and an unnamed other person(s); (b) denying the government's request to bar missing witnesses; (c) prohibiting evidence or testimony about alleged gang membership; and (d) permitting evidence and argument about punishment.

DATE:	August 10, 2018		Respectfully submitted,

					By:	s/Andréa E. Gambino
						Attorney for Levaughn Collins

Law Offices of Andréa E. Gambino
53 W. Jackson Blvd., Suite 1332
Chicago, Illinois 60604
(312) 322-0014
agambinolaw@gmail.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 10, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Katherine Sawyer, Esq.
Assistant United States Attorney
219 S. Dearborn Street
Chicago, Illinois 60604

and I hereby certify that I have mailed by United State Postal Service or hand delivered the document to the following non-CM/ECF participants: N/A.

DATE:　　　August 10, 2018　　　Respectfully submitted,

　　　　　　　　　　　　　　　　By:　s/Andréa E. Gambino
　　　　　　　　　　　　　　　　　　　Attorney for Levaughn Collins

Law Offices of Andréa E. Gambino
53 W. Jackson Blvd., Suite 1332
Chicago, Illinois 60604
(312)322-0014
agambinolaw@gmail.com